MICHAEL RHODES-DEVEY
   ATTORNEY AT LAW

518-452-1800
450 NEW KARNER ROAD
P.O. BOX 15072
ALBANY, NEW YORK 12212-5072
FAX 518-452-6435
E-MAIL:    DeveyLaw@ aol.com

April 16, 2010

Judge David N. Hurd
U.S. District Court Judge
Alexander Pirnie Federal Building
10 Broad Street
Utica, NY 13501-1233

Re:    United States v. Eric Wilson
        Case # 10-CR-00068 DRH

Dear Judge Hurd:

    I am submitting this letter brief in response to the Government's Response to Motion to Suppress pursuant to the Order of this Court dated April 15, 2010.

TRIBAL POLICE LACK OF AUTHORITY

    The Government's Response does not address the issue that the Tribal Police Officers had no legal authority as Police Officers at the time of the stop of the Defendant. This is critical as the grounds for the stop was an obstructed license plate, which Defendant contents, regardless, was conducted as a false pretext stop. However, as the stop occurred in the Bombay Triangle, these officers had no legal authority to conduct the stop.

    Further, Government's Exhibit #1, the Designation, Customs Officer (Excepted) for Matthew Broderick is restricted in ways that are not clear. The document states, "These authorities are designated to you while assigned to an ICE Taskforce and operating under ICE authority." The Government has set forth no evidence that either of these criteria were met.

    The context of the Designation is clearly to Matthew Rourke as a member of the St. Regis Mohawk Tribal Police. See Government Exhibit #1, Section 4. As the Tribal Police have no authority outside of the legal boundary of the Tribal Territory, it is unclear if the designation went to Matthew Rourke as a private citizen, as he was acting when he conducted a "traffic stop" over the Defendant for an obstructed license Plate pursuant to New York Vehicle and Traffic Law.

    The United States Attorney's Office for the Northern District of New York has a long history of a lack of confidence and trust in the Saint Regis Mohawk Tribal Police. Indeed, most members of the Tribal Police received designation as BIA Law Enforcement Officers in the late 1990's but

such designation was limited by statute to the authority being approved by the regional US Attorney, such approval was never forthcoming. I was the attorney for the Tribal Police during this period and have personal knowledge of this issue.

On the face of the motion we know that the Tribal Police Officers did not have authority to conduct the V&T stop, that their statements indicate that they pulled the Defendant's vehicle over for the V&T violation, and that in any event, it is unclear that Mr. Rourke had authority under his Excepted Customs Officer Designation to even act in that capacity.

### THE SEARCH REQUIRED PROBABLE CAUSE AS IT WAS NOT AT A "FUNCTIONAL EQUIVALENT OF THE BORDER"

The Government argues that the stop was at the functional equivalent of a border and therefore required no probable cause. This position cannot be supported.

Under *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975), and United States v. Cortez, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), Border Patrol agents on roving patrol may stop a vehicle only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that that particular vehicle is involved in illegal activity." *United States v. Villalobos*, 161 F.3d 285, 288 (5th Cir. 1998); *United States v. Zapata-Ibarra*, 212 F.3d 877, 881-882 (5th Cir. Tex. 2000).

At the border of the United States, Federal agents may, without warrant or even suspicion, detain and search individuals, as courts have deemed such actions historically reasonable within the ambit of the 4th Amendment. *Carroll v. United States*, 267 U.S. 132, 154, 69 L. Ed. 543, 45 S. Ct. 280 (1925) (national self protection reasonably requires determination of whether person and his belongings may legally enter the country); United States v. Ramsey, 431 U.S. 606, 619, 52 L. Ed. 2d 617, 97 S. Ct. 1972 (1977). The same rule applies to those places that are the functional equivalents of the border. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1972); United States v. Brown, 499 F.2d 829 (7th Cir.), cert. denied, 419 U.S. 1047, 42 L. Ed. 2d 640, 95 S. Ct. 619 (1974). Recognized functional equivalents of the border of the United States include an established station near the border, a point marking the confluence of two or more roads that extend from the border, or that portion of an airport where passengers deplane from international flights. *Almeida-Sanchez*, supra, 413 U.S. at 273. *United States v. Deval*, 612 F. Supp. 329, 332 (D. Vt. 1985).

Roving patrols of border agents may not conduct searches without probable cause, *United States v. Ortiz*, 422 U.S. 891, 896-97, 45 L. Ed. 2d 623, 95 S. Ct. 2585 (1975) (probable cause necessary for automobile search at a permanent checkpoint); *United States v. Sugrim*, 732 F.2d 25, 29 (2d Cir. 1984)(searches at temporary checkpoints by roving patrols may not be conducted on less than probable cause) *United States v. Sugrim*, *supra,* at 29.

The Government relies upon the case of *United States v. Gaviria*, 805 F.2d 1108 (2d Cir.1986) for the proposition that the roving patrol was actually the functional equivalent of the border crossing. In that court's view, New York was the functional equivalent of the country's border

because: (1) it was the intended final destination of the goods; (2) *the goods had traveled in the United States under Customs bond; and* (3) there was no evidence that any tampering had occurred in transit. See also, *United States v. Caminos*, 770 F.2d 361, 365 (3d Cir. 1985) (Pittsburgh was the functional equivalent of the border for *package* sent there after domestic stops in New York and Chicago); *United States v. Sheikh*, 654 F.2d 1057 (5th Cir. 1981), (Dallas the functional equivalent of the border for *package* sent from Iran with preliminary stop in Houston), cert. denied, 455 U.S. 991, 102 S. Ct. 1617, 71 L. Ed. 2d 852 (1982); *United States v. Gallagher*, 557 F.2d 1041 (4th Cir.), (Norfolk was functional equivalent of the border for a camper sent there from Portugal with initial arrival at port of Baltimore), cert. denied, 434 U.S. 870, 98 S. Ct. 213, 54 L. Ed. 2d 148 (1977); *United States v. Bareno-Burgos*, 739 F. Supp. 772, 778-779 (E.D.N.Y. 1990).

However, neither the facts nor law of those cases support the Government's position. As the facts were stated in *Gaviria:*

> The shipment arrived at JFK on May 13, 1985, and the cartons were secured at an airport container station to await final customs inspection. *After its arrival in the United States, the shipment was, at all times, under a customs bond.*

*United States v. Gaviria*, 805 F.2d 1108, 1110 (2d Cir.1986).

First, all of the cited cases refer to *packages* in transit form a foreign country to a final destination somewhere within the United States. Obviously, that is not the case here. Further, there is no continuity of custody of the Defendant's vehicle by ICE form the Border to the stop. Indeed, if we are to believe the Tribal Police Officers, they could not match the license plate of the Defendant's vehicle to that spotted earlier as they could not read it.

Finally the Government argues that the authority granted by gives ICE agents unbridled authority to search anyone, anywhere. However, while couched in very broad language, 19 USC §1581(a) is circumscribed by the reasonableness requirement of the Fourth Amendment. *United States v. Serrano*, 607 F.2d 1145, 1147 (5th Cir.), cert. denied, 445 U.S. 965, 100 S. Ct. 1655, 64 L. Ed. 2d 241 (1980); *United States v. Freeman*, 579 F.2d 942, 945 (5th Cir. 1978); *United States v. D'Antignac*, 628 F.2d 428, 432-433 (5th Cir. 1980).

I appreciate the Court's consideration in this matter.

Very truly yours,

/s/ Michael Rhodes-Devey

Michael Rhodes-Devey

cc:   Elizabeth A. Horsman, AUSA